41 F.3d 345
 66 Fair Empl.Prac.Cas. (BNA) 739
 Susan BRISTOW, Plaintiff-Counterdefendant, Appellant-Cross-Appellee,
v.
DRAKE STREET INCORPORATED, Drake Street/Chicago Shoes, John
Powers, et al., Defendants-Counterplaintiffs,
Appellees-Cross-Appellants.
 Nos. 92-1381, 92-1409 and 92-1497.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 12, 1994.
Decided Dec. 1, 1994.
Rehearing Denied Feb. 1, 1995.
 
 Nancy G. Lischer, Michael J. Leech (argued), D. Kendall Griffith, Hinshaw & Culbertson, Penny Nathan Kahan, Lori D. Ecker, Chicago, IL, for plaintiff-appellant.
 Margaret M. Basch (argued), Schaumberg, IL, for defendants-appellees.
 Before POSNER, Chief Judge, and GODBOLD* and FLAUM, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 John Powers is the author and producer of the play Do Black Patent Leather Shoes Really Reflect Up? After its initial run, he took the show on the road between 1984 and 1987. Susan Bristow, whom Powers employed as associate producer of the play throughout its second run but fired before the expiration of her contract, brought this suit against him and two companies that he controls (we can ignore the companies). Contending that he fired her because she refused to yield to his sexual importunings, Bristow charges sex discrimination in violation of Title VII of the Civil Rights Act of 1964, breach of contract, and tortious infliction of emotional distress. The jury awarded $30,000 on the tort claim but returned a verdict for Powers on the contract claim. The Title VII charge was tried to the judge, who found that Bristow had been fired not because of sex but because Powers had decided to close the show because it was losing money. The judge further found, however, that Powers had denied Bristow two weeks of post-closing employment (in which she would have been dealing with the odds and ends incident to shutting down the show) on sexual grounds. But the judge ruled that Bristow had waived any claim for damages arising out of that denial, and he therefore awarded her only $1--nominal damages--for the violation of her rights under Title VII.
 
 
 2
 The judge's ruling that Bristow had waived her claim for damages for the denial of employment after the show closed was error. She returned the check for two weeks' pay that Powers sent her because she was afraid that by cashing it she would be conceding that her termination was not a breach of contract. The fear was groundless; a creditor does not, merely by accepting partial payment of the amount that he claims is due him, waive his entitlement to the rest. Hepperly v. Bosch, 172 Ill.App.3d 1017, 123 Ill.Dec. 70, 74-75, 527 N.E.2d 533, 537-38 (1988). Since the check did not contain a notation that it was an offer to settle all outstanding disputes between the parties, there was no danger that by cashing it Bristow would be deemed to have entered into an accord and satisfaction, as in A.F.P. Enterprises, Inc. v. Crescent Pork, Inc., 243 Ill.App.3d 905, 183 Ill.Dec. 356, 360-61, 611 N.E.2d 619, 623-24 (1993). But no reason is suggested why a groundless fear of losing one's claim should be deemed a waiver of that claim. Nor do any of the circumstances surrounding Bristow's refusal to cash the check create the elements of a waiver, estoppel, or other mode of forfeiture. Quite the contrary. It was plain that Bristow wanted to be paid and that she received no consideration for surrendering a right to be paid; there is no indication that Powers was prejudiced in his defense of this suit or otherwise by her refusing to cash the check; and there was doubtless some possibility that if she accepted it Powers would attempt to use that acceptance in some way in defense against her suit. Her entitlement to interest might be affected by her refusal to accept the check, but that has not been made an issue.
 
 
 3
 An amendment to Title VII made in 1991 allows the award of common law damages for sexual harassment of an employee, 42 U.S.C. Sec. 1981(a), thus enabling the employee to obtain monetary relief even if she was not fired on account of sex and therefore has no claim for back pay or reinstatement. Brooms v. Regal Tube Co., 881 F.2d 412, 423 (7th Cir.1989). Applying the amendment retroactively, the district judge held that Bristow would have been entitled to such damages had the jury not already awarded them for tortious infliction of emotional distress. The judge's ruling that the 1991 amendment applies retroactively was error, because the harassment ended before the amendments became effective. The judge ruled on the question of retroactivity before this court and later the Supreme Court decided against retroactivity. Mozee v. American Commercial Marine Service Co., 963 F.2d 929 (7th Cir.1992); Luddington v. Indiana Bell Tel. Co., 966 F.2d 225 (7th Cir.1992); Landgraf v. USI Film Products, --- U.S. ----, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994); Rivers v. Roadway Express, Inc., --- U.S. ----, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994).
 
 
 4
 Bristow's appeal challenges not only the judge's refusal to award her damages for breach of the post-closing term of her employment contract, but also his admission of parol evidence concerning Powers's contractual right to fire her and his finding that sex was not a cause of the firing. Powers's appeal challenges not only the retroactive application of Title VII but also the jury's verdict on tortious infliction of emotional distress; and let us turn to that verdict. The evidence, construed favorably to Bristow as it has to be in view of the verdict, shows that between the early months of 1985, when she terminated a sexual relationship with Powers that had begun shortly after she was hired, and her firing by him in April of 1987, he subjected her to a protracted series of outrages that included firing her between 12 and 40 times--the record is unclear--and promptly rehiring her (all but the last time), yelling at her, following her around at work, stalking her in nonworking hours, banging on the door of her apartment late at night, calling her ten to thirty times a night, and leaving messages on her telephone answering machine that he hated her and wished her dead. No one should have to put up with such abuse, and it would be surprising if the law of Illinois did not provide a tort remedy for it, which plainly it does.
 
 
 5
 But it is not enough that the defendant's conduct was outrageous; the emotional distress that it inflicted must be severe. It is true that the plaintiff is not required to prove that the defendant's conduct provoked a physical reaction, Corgan v. Muehling, 143 Ill.2d 296, 158 Ill.Dec. 489, 494-96, 574 N.E.2d 602, 607-609 (1991); cf. Kolegas v. Heftel Broadcasting Corp., 154 Ill.2d 1, 180 Ill.Dec. 307, 319, 607 N.E.2d 201, 213 (1992); Restatement (Second) of Torts Sec. 46, comment j (1965), though Bristow actually did have a physical reaction--hives--and it was the jury's prerogative to exonerate the kitten on whom Powers ungallantly tried to pin the blame, and lay the blame squarely on Powers. Bristow testified that she had owned cats for many years without having any allergic reaction to them.
 
 
 6
 There is no fixed threshold of severity that purely emotional or psychological distress must cross in order to make the defendant's conduct actionable. But McGrath v. Fahey, 126 Ill.2d 78, 127 Ill.Dec. 724, 727, 533 N.E.2d 806, 809 (1988), quotes with approval the Restatement's formulation: "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." Restatement, supra, Sec. 46, comment j. Obviously, this is not a bright-line test. On one side, we have Swanson v. Swanson, 121 Ill.App.2d 182, 257 N.E.2d 194, 196 (1970), which held that evidence that the plaintiff "was nervous and had many sleepless nights and he thought he was going to have nightmares" about the incident (his brother's failure to tell him about their mother's death), did not establish the required severity. On the other side, we have Pavilon v. Kaferly, 204 Ill.App.3d 235, 149 Ill.Dec. 549, 556, 561 N.E.2d 1245, 1252 (1990), which held that evidence that the plaintiff "was forced to continue her psychotherapy treatment and ... [was] scared, angry, and unable to cope with her child, her work and her relationship with men generally" did. This case falls on Pavilon's side of the line. Even if hives alone are not enough to establish severe emotional distress--and probably they are not--there was much more here: evidence of stomach pains and vomiting, and evidence that Bristow had "shut down as a personality," an expression that witnesses elaborated by explaining that she had "stopped talking ... stopped eating ... lost weight ... did her job, but she was not functioning ... was not a happy person ... cried all the time ... was distraught ... too thin ... constantly crying ... inhibited ... appeared frightened."
 
 
 7
 Bristow did not consult a psychiatrist, but if that were a requirement for liability the only effect would be to increase psychiatrists' incomes. She did present medical evidence, though that was not required either. See Corgan v. Muehling, supra, 574 N.E.2d at 609. The cases, moreover--inelegantly but, because of the inherent vagueness of the concept of severe emotional distress and the difficulty of establishing its presence with any reliability, realistically--tend to merge the issue of the outrageousness of the defendant's conduct with the issue of the severity of the plaintiff's emotional distress, in effect requiring more evidence of outrageousness the weaker the evidence of distress, as in the recent case of Khan v. American Airlines, 266 Ill.App.3d 726, 203 Ill.Dec. 171, 176, 639 N.E.2d 210, 215 (1994). The Restatement noted this tendency. "Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." Restatement, supra, Sec. 46, comment j, p. 78. Powers's behavior was extreme and outrageous.
 
 
 8
 We turn to Bristow's appeal. In March 1987 she and Powers signed an employment contract; until then she had been an employee at will. In the contract, Powers agreed to employ Bristow as associate producer of the show for a period of two years ending on January 5, 1989 (so actually less than two years, since the contract, though retroactive to January 5, 1987, was not signed until March). The contract goes on to provide that "During the term of this Agreement, as payment for all services rendered hereunder, Employer shall pay to Employee no less than the salary of Thirteen Hundred Dollars ($1,300.00) per week plus one-half per cent ( 1/2%) of the total of the gross weekly box office receipts.... The salary defined herein shall be earned weekly and shall be payable in periodic installments no less frequently than twice monthly for the preceding two week period during the term of this Agreement." The contract authorizes Bristow to terminate the contract, before its scheduled expiration in January 1989, upon thirty days prior written notice or (again by written notice, but with no waiting period) if "employer shall cease conducting its business" or become insolvent. But the only ground on which Powers can terminate the contract without liability is if Bristow is convicted of a crime. "If the Employee is terminated by Employer for any reason other than a conviction of illegal acts in connection with the performance of her duties under this Employment Agreement then such termination shall be deemed a breach of this Agreement." Finally, the contract contains a standard integration clause, reciting that it is the complete agreement of the parties and supersedes all previous representations or agreements, written or oral.
 
 
 9
 The month after the signing of the contract Powers closed the show and fired Bristow. Her contract claim is to the salary that she would have received between then and the scheduled expiration of the contract. She argued in the district court that the language of the contract is clear and unequivocal and that the submission to the jury of evidence to explain what the parties really intended by that language was barred by the parol evidence rule. The judge disagreed, and allowed testimony, and Powers convinced the jury that the payment of Bristow's salary was contingent on the show's remaining open, notwithstanding Bristow's testimony that she had insisted on an ironclad contract precisely because of the incessant if transient firings to which Powers had subjected her. She feared that he would close the show just to hurt her; her theory of the principal Title VII violation that she alleged was that he had done precisely that.
 
 
 10
 We agree that the contract is clear "on its face"; a reader having a normal command of English but not knowing anything about the circumstances of this contract or the class of contracts that it instantiates would think it obvious that Powers could not fire Bristow merely because he was closing the show. The contract is a term contract, not an at-will contract, and specifies in meticulous detail the circumstances in which the contract can be terminated by either party without liability before the expiration of the term. The contract is explicit that Bristow can be fired only for a criminal act.
 
 
 11
 If a contract so drafted can be upended by the self-serving oral testimony of one party to it that his duty to perform was actually dependent on a condition nowhere expressed in the contract and flatly contradicted by what is expressed in the contract ("If the Employee is terminated by Employer for any reason other ... [than a criminal act relating to the performance of her duties] then such termination shall be deemed a breach of the Agreement"), the parol evidence rule is dead and integration clauses ineffectual. The rule is not dead in Illinois, Kendall v. Kendall, 71 Ill.2d 374, 16 Ill.Dec. 938, 940, 375 N.E.2d 1280, 1282 (1978); In re Marriage of Osborn, 206 Ill.App.3d 588, 151 Ill.Dec. 663, 668, 564 N.E.2d 1325, 1330 (1990); Havoco of America, Ltd. v. Sumitomo Corp., 971 F.2d 1332, 1338 n. 4 (7th Cir.1992), and we have neither authority nor desire to kill it. We do not agree with Powers that the language "as payment for all services rendered hereunder" and "the salary defined herein shall be earned weekly" injects the necessary element of ambiguity. (Powers goes further and argues that this language makes the contract absolutely clear that he had a right to fire her if the show closed. That is absurd.) The first phrase quoted is just a recital that his promise to pay the employee's salary is supported by consideration and thus is legally enforceable; it does not specify a particular length or amount of service that the employee must render over the life of the contract. The second quoted phrase, about salary accruing weekly, emphasizes the employer's contractual duty to pay promptly, continuously; activates the employee's statutory entitlement to receive wages for work done, see Wage Payment and Collection Act, Ill.Rev.Stat. ch. 48, pp 39m-1 to 39m-16; and might give the employee a leg up in bankruptcy, should she have to file a claim for her wages there. See 11 U.S.C. Sec. 507(3); In re Amarex, 853 F.2d 1526, 1531-32 (10th Cir.1988). It has nothing to do with requiring that she be working every week in order to be entitled by the contract to her salary.
 
 
 12
 The possibility that a theatrical production will close is ever-present to the minds of people involved in the theater. If Powers wanted to make Bristow's continued entitlement to salary contingent on such a foreseeable eventuality, he could easily have written such a condition into the contract.
 
 
 13
 We are mindful of the dangers involved in using the parol evidence rule or the closely related "four corners" doctrine, Riney v. Weiss & Neuman Shoe Co., 217 Ill.App.3d 435, 160 Ill.Dec. 375, 380, 577 N.E.2d 505, 510 (1991); Coplay Cement Co. v. Willis & Paul Group, 983 F.2d 1435, 1438 (7th Cir.1993); Patton v. Mid-Continent Systems, Inc., 841 F.2d 742, 745 (7th Cir.1988), to enforce acontextual contractual interpretations. Words in common usage may also bear technical meanings unknown to judges or juries unenlightened by testimony; and contractual language may be "clear on its face" only because the outsider, the generalist, is unaware of understandings among insiders so deep that the need to express them is not felt. (We have already suggested that this might be the case here.) The law responds to this problem in several ways. One is by allowing the submission of extrinsic evidence to the judge for a determination whether a knowledgeable insider would think the written contract meant something different from what it appeared to mean. Riney v. Weiss & Neuman Shoe Co., supra, 577 N.E.2d at 509-10. Only if the judge is persuaded by the evidence does he allow the jury to consider it. This is the doctrine of "extrinsic ambiguity" (on which see also In re Stoecker, 5 F.3d 1022, 1029-30 (7th Cir.1993) (Illinois law))--which however Powers has not invoked, and has therefore waived.
 
 
 14
 Second, evidence of "trade usage," more broadly of meanings that members of the trade or calling out of which the contract arose would attach to apparently clear words, phrases, or sentences, meanings that may be different from the meaning that these "clear" terms bear in ordinary discourse, is admissible to interpret a seemingly clear contract. Latex Glove Co. v. Gruen, 146 Ill.App.3d 868, 100 Ill.Dec. 488, 492, 497 N.E.2d 466, 470 (1986); 2 E. Allan Farnsworth, Farnsworth on Contracts Sec. 7.13 (1990). The difference between such evidence and testimony by a party to the idiosyncratic meanings that he and his opponent attached (he says) to the words they used when they were negotiating the contract is that evidence of trade usage is objectively verifiable. It is evidence about what words, phrases, etc. mean to a community, not merely to a pair of individuals; it is evidence about a public, not a private, language--evidence that is the equivalent, really, of a specialized dictionary. In re Envirodyne Industries, Inc., 29 F.3d 301, 305 (7th Cir.1994). Because it is evidence about public facts, public meanings, it is less easy to fake. Allowing it into evidence therefore does less harm to the desire of parties who enter into written contracts to fix their agreement in a form that will protect commitments against being upset by juries. Even so, Illinois courts seem unwilling to admit evidence of trade usage unless the text of the contract seems to admit of some doubt or uncertainty. E.g., Bean v. Norfolk & Western Ry., 84 Ill.App.3d 395, 39 Ill.Dec. 665, 673-74, 405 N.E.2d 418, 426-27 (1980).
 
 
 15
 So: evidence of what Powers and Bristow "really" meant when they chose a form of words that points to an utterly different meaning was barred by the parol evidence rule. Evidence of trade usage--evidence for example that of course it is understood in the theater world that term contracts are contingent on the show's remaining open, so well understood that parties don't bother to write such a condition into their contracts--might have been admissible, too (though cases like Bean give us pause), but Powers made no effort to present such evidence. Nor did he ask the judge to consider other extrinsic evidence that might reveal an ambiguity in the contract; nor does he defend the submission of that evidence to the jury by reference to the doctrine of extrinsic ambiguity. None of that evidence should have gone to the jury, therefore, and without it or evidence of trade usage the contract was clear and Bristow entitled to judgment.
 
 
 16
 Since the damages to which she is entitled by virtue of Powers's breach of contract and the back pay to which she would be entitled if she proved that she was fired before the contract's expiration because of her resistance to Powers's sexual importunings are almost certainly the same amount, our resolution of the contract appeal may appear to render the Title VII issue moot. Not so. Bristow cannot obtain attorney's fees for breach of contract, and it is exceedingly unlikely that she can obtain attorney's fees if the only relief to which she is entitled under Title VII is nominal damages. Although the award of nominal damages made her the prevailing party in the Title VII phase of this litigation, entitling her to an award of reasonable attorney's fees, Farrar v. Hobby, --- U.S. ----, ----, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992), reasonableness implies commensurability with results obtained. The Supreme Court has made clear that if all you win in a Title VII case is nominal damages (with no punitive damages and no injunctive or declaratory relief--nothing but $1 in compensatory damages, as here), the reasonable attorney's fee, one commensurate with results obtained, is--zero. Id. at ----, 113 S.Ct. at 574-75. Unless, perhaps (as seems implicit in the Supreme Court's qualifying the statement that we have just paraphrased with a "usually"), the decision creates benefits for other persons in the plaintiff's situation, for example by establishing a significant precedent that is likely to alter the behavior of potential defendants, Cabrera v. Jakabovitz, 24 F.3d 372, 393 (2d Cir.1994), though this court has not approved an award of attorney's fees on this basis since Farrar. See Cartwright v. Stamper, 7 F.3d 106, 109-10 (7th Cir.1993); Maul v. Constan, 23 F.3d 143 (7th Cir.1994).
 
 
 17
 A dictum in Farrar casts doubt on whether a plaintiff can ever be a prevailing party within the meaning of statutes entitling a prevailing party to an award of attorney's fees unless the plaintiff obtains "an enforceable judgment ... or comparable relief through a consent decree or settlement." --- U.S. at ----, 113 S.Ct. at 573. A divided panel of this court recently rejected the dictum. Zinn v. Shalala, 35 F.3d 273 (7th Cir.1994). The question is any event different from whether, if the only judgment is one for nominal damages, the plaintiff can obtain an award of attorney's fees. Maybe so (there is at least an enforceable judgment), in exceptional circumstances. But it neither is argued, nor would it be plausible in the circumstances of this case to claim, that the judgment for $1 in this case conferred a substantial benefit on Bristow or anyone else. Compare Lenard v. Argento, 808 F.2d 1242, 1248 (7th Cir.1987). To get attorney's fees, Bristow must show that she was fired because of sex.
 
 
 18
 Was she? Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), holds that if an employer has mixed motives in firing an employee, and one of the motives is discriminatory and the other is not, the employer has the burden of persuading the trier of fact that it would have fired the employee even if there had been no discriminatory motive. So while the plaintiff in a Title VII case is not entitled to win unless had it not been for the unlawful motive he would have retained his job, if he shows that the employer had an unlawful motive the burden of persuasion on the issue of whether the employee would have been retained had that motive not been in play--an issue of "causation" on which the burden of persuasion ordinarily would have rested on the plaintiff, just as in an ordinary common law tort case--shifts to the defendant, the employer. The district judge thought that Powers had such compelling financial motives for closing down the show that he would have done so regardless of his animosity toward Bristow. But in reaching this conclusion the judge did not apply the test of Price Waterhouse. He did not place the burden of persuasion on the employer, on Powers.
 
 
 19
 This error does not justify reversal, however. Burdens of persuasion affect the outcomes only of cases in which the trier of fact thinks the plaintiff's and the defendant's positions equiprobable. Burdens of persuasion are, in other words, tie-breakers. If the trier of fact, having heard all the evidence, comes to a definite conclusion, he has no occasion to invoke a burden of persuasion. Judge Zagel thought that Powers would not have closed the show for nonfinancial reasons. For Powers was not only the producer; he was the playwright. Vanity alone would have made it unlikely that he would close his own show merely to get back at Bristow. He would be cutting off his nose to spite his face, as Judge Zagel put it. If this is what the judge believed, he would have believed it whether or not he had ever heard of Price Waterhouse. The doctrine of that case, we repeat, is designed for the situation in which the trier of fact cannot figure out what would have happened had the unlawful motive been absent.
 
 
 20
 Bristow fastens on the following passage in the judge's oral opinion as proof that the judge would have reached a different result had he applied the rule of Price Waterhouse: "I have found that the quid pro quo did not exist, or more importantly I have--more correctly I found that the evidence is evenly balanced, and I believe that the plaintiff has the burden of showing that there was a quid pro quo; and I think under those circumstances the plaintiff loses." "Quid pro quo" is a term of art in the law of sex discrimination. Beware terms of art in law; they are potent sources of confusion. We must attend to what Judge Zagel meant by his use of the term. From an earlier passage in his oral opinion it is apparent that what he meant was that Powers had not in fact conditioned Bristow's continued employment on her having sex with him. But this means that sex was not a motive in her firing. If Powers had fired her because she refused to continue having sex with him after the early months of 1985--if that refusal had been a cause or the cause of the firing--then there would have been an unlawful motive for her firing and the question would be whether she would have been fired anyway; and then the burden would have been on Powers to prove that he would have fired her anyway. But if the district judge believed that sex was not the "quid" for the "quo" of continued employment, this means that sex played no role in her being fired and the Price Waterhouse issue does not arise.
 
 
 21
 There are other indications that Judge Zagel believed that sex had played no role in Bristow's being fired; had been in other words no motive at all. He said, "I do not believe finally that he discharged her ... for her refusal to have sex with him. I think the argument that this show closed for some other reason than it was a loser is not valid." After noting that the play had lost money in city after city, the judge added, "I think on the basis of the evidence I've heard in this case the question is not why it [the show] closed May 3rd. The question is why it didn't close earlier.... I believed Powers when he said that he didn't close it for any other reason than finances.... I frankly believe that if Powers could have kept the show open at a break even basis, he would have been willing to do so." If the judge was right--and there is no argument that if he was wrong, he was clearly wrong--then sex played no role whatever in the decision to close the show and fire Bristow. And if sex played no role, it was not a mixed-motives case after all, and Price Waterhouse has no place in it.
 
 
 22
 "[C]lose the show and fire Bristow." But these are distinct acts. One can imagine Powers's closing the show only because it was losing, but breaking his contract with Bristow because of her refusal to have sex with him. (After all, she recorded a phone conversation, six months before her last firing, in which he told her, "I'm firing you for not fucking me, period.") But she has not tried to separate these issues, save as regards the post-closing employment. She seems to concede that if Powers closed the show purely for financial reasons, he fired her for the same reasons. Which makes sense. If he was unwilling to pay to keep the show open, he was unlikely to be willing to pay her $1,300 a week for another twenty months, which would come to more than $100,000, especially if he believed that the contract entitled him to terminate her in these circumstances without liability. He might well have fired her even if he had not closed the show; but under Price Waterhouse, a plaintiff cannot obtain damages if the trier of fact is convinced that even if sex had played no role in the decision to fire her (however large a role it played in fact), she would have been fired; for she has suffered no harm by reason of sex that she would not have suffered anyway. The 1991 amendments to Title VII authorize the award of attorney's fees in such a situation, see 42 U.S.C. Sec. 2000e-5(g)(2)(B)(i), but the amendments are not applicable to this case.
 
 
 23
 We have been quoting from the district judge's oral opinion. Later he rendered a written opinion, in which he adhered to his conclusion that Powers had not discharged Bristow because of sex. The written opinion makes a little clearer that this is not a Price Waterhouse case, even if it also suggests a less confident assessment of the evidence concerning the reasons behind the decision to close the show. "She was discharged," the written opinion states, "because the show closed and the decision to close the show was motivated by money not sex. Did sex have any role in the decision to close the show? On this point the evidence is, at best, in equipoise. Therefore, on the question of whether defendants extracted a quid pro quo from plaintiff, I find in favor of defendants because plaintiff has the burden of proof." Bristow had the burden of persuading the judge that sex was a, not necessarily the, motive for closing the show (had "any role in the decision to close the show"). Because she had the burden of persuasion on the question whether sex was a motive, the determination that the evidence was in equipoise doomed her case. Only if she had shown that sex was a motive would the burden have shifted to the defendant to show that, even so, she was not harmed, because she would have been fired even if the unlawful motive had been absent. If the evidence on that issue had been in equipoise, she would have been entitled to a judgment; but that issue could not even arise unless and until she showed that sex was one motive; the judge held that it was no motive. So this is not even a mixed-motives case, and the issue of causality does not arise.
 
 
 24
 The judgment for the plaintiff on the tortious claim of intentional infliction of emotional distress is affirmed. The judgment for the defendant on the breach of contract claim is reversed and the matter remanded with directions to enter judgment on liability for the plaintiff and proceed to the assessment of damages. The determination that the defendant violated the plaintiff's rights under the 1991 amendments to Title VII is also reversed, together with the determination that the plaintiff suffered only nominal damages for the violation of her rights under the pre-1991 version of Title VII to post-closing employment. On remand the district judge will have to recompute the plaintiff's monetary relief for the loss of her post-closing employment and redetermine her entitlement to attorney's fees under Title VII. As should be clear from our discussion of the Price Waterhouse issue, the only basis for an award of attorney's fees is the denial of Bristow's right to post-closing employment. With damages for that denial limited to two weeks' pay, only a modest award of attorney's fees seems indicated; but we leave that matter to be determined by the district judge in the first instance.
 
 
 25
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 *
 Hon. John C. Godbold of the Eleventh Circuit