61 F.3d 560
 149 L.R.R.M. (BNA) 2980, 32 Fed.R.Serv.3d 317,
Pens. Plan Guide P 23911Y
 William R. MURPHY, W. Darrel McCabe, Richard L. Adkins, et
al., Plaintiffs-Appellants,
v.
KEYSTONE STEEL & WIRE COMPANY, a DIVISION OF KEYSTONE
CONSOLIDATED INDUSTRIES, INCORPORATED, a Delaware
Corporation, and Keystone Steel & Wire
Company Health Care Benefit
Plan, Defendants-Appellees.
 No. 94-2292.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 6, 1995.
Decided July 28, 1995.
 
 Ronald Hamm (argued), Hamm & Hanna, Peggy L. Jans, Peoria, IL, for plaintiffs-appellants.
 Stephen D. Gay, Jeffrey A. Ryva (argued), Husch & Eppenberger, Peoria, IL, for defendants-appellees.
 Before MANION and ROVNER, Circuit Judges, and NORGLE, District Judge.*
 MANION, Circuit Judge.
 
 
 1
 In February of 1993, Keystone Steel & Wire Company ("Keystone") announced its intent to modify the retiree benefits portion of its employee welfare benefits plan. William Murphy and others brought a class action, alleging that Keystone's unilateral changes to its welfare benefits plan violated various collective bargaining agreements, the plan itself, and ERISA. The district court certified the class and ultimately granted summary judgment for Keystone finding no breach of the relevant bargaining agreement or benefits plan, and no actionable violation of ERISA. We affirm.
 
 I. Background
 
 2
 Keystone is a manufacturer of steel products. The International Steelworkers Alliance ("ISWA" or the "Union") represents Keystone's employees, including the named plaintiffs and other members of the certified class. Keystone and the Union have worked together since at least 1960. Early on, Keystone developed an employee benefits plan to provide certain health and insurance benefits for its employees and retirees. Later, Keystone and the Union formed the Joint Insurance Commission ("JIC"), which was composed of company and union representatives. The JIC negotiated changes to the Plan. These negotiated changes were approved by the parties in connection with their collective bargaining agreements. These bargained-for modifications of the benefits plan were often set forth in memoranda attached to the collective bargaining agreements. Later, benefit changes were incorporated directly into the benefits plan.
 
 
 3
 Murphy and the other named plaintiffs are members of a certified class of employees who retired from Keystone before May 3, 1993, but who had not yet reached age 65.[1] They were members of the Union while employed at Keystone, and after retirement they received benefits under Keystone's welfare benefits plan. In February 1993, Keystone announced its intent to make certain unilateral changes to its welfare benefits plan when the existing collective bargaining agreement expired in May of 1993. Keystone's changes, which would take effect on July 1, 1993, increased various deductibles and co-payments that Murphy would have to satisfy in order to receive benefits under the plan. Murphy filed a class action complaint alleging that these unilateral changes violated ERISA, the benefits plan and the CBA between the parties. The collective bargaining agreement ("CBA") at issue covered the period May 3, 1990-1993; and that CBA incorporated by reference Keystone's 1986 employee welfare benefits plan (the "Plan").[2]
 
 
 4
 Murphy's complaint had three counts. In Count I Murphy alleged that the CBA entitled him, his spouse and eligible dependents to continued benefits through the lifetime of each retired employee and their surviving spouses. In Count III Murphy made the same claim but rested it directly on the terms of the Plan and certain documents distributed to Keystone employees upon their retirement. Taken together, these counts alleged that the retirees were entitled to vested benefits under the CBA or the Plan and related documents. In contrast, Count II had a statutory basis. In this count Murphy argued that Keystone's unilateral changes to the plan violated ERISA, because the Plan did not include procedures to identify who had authority to amend the Plan or procedures defining how the Plan could be amended. According to Murphy, Keystone's failure to comply with this statutory requirement rendered the Plan unamendable and rendered Keystone's amendments null and void.
 
 
 5
 In a comprehensive opinion, the district court found that when the CBA and Plan were read together they were unambiguous and they clearly indicated that Murphy's benefits did not vest. The district court also rejected Murphy's ERISA claim. Here the court held that Keystone had an inherent authority to amend the Plan as its administrator, and that Keystone's amendments were valid because Murphy had not shown bad faith, active concealment, or detrimental reliance. Murphy appeals.
 
 II. Analysis
 
 6
 We review the district court's grant of summary judgment de novo, viewing all the evidence in the light most favorable to the plaintiff and according him the benefit of all the reasonable inferences. Krawczyk v. Harnischfeger Corp., 41 F.3d 276, 278 (7th Cir.1994). Summary judgment is appropriate if the record reveals that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id. Murphy's claim rests on Keystone's employee benefits plan which is a welfare benefits plan as defined in 29 U.S.C. Sec. 1002(1). As such, his claim presents an issue of contractual interpretation, because ERISA does not require the vesting of welfare benefits. See Curtiss-Wright Corporation v. Schoonejongen, --- U.S. ----, ----, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995); Land v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Health and Welfare Fund, 25 F.3d 509, 514 (7th Cir.1994).
 
 
 7
 Summary judgment is particularly appropriate in cases involving the interpretation of contracts. Ryan v. Chromalloy American Corp., 877 F.2d 598, 602 (7th Cir.1989). Where the contract is unambiguous, a court must determine the meaning of the contract as a matter of law. Id. The document should be read as a whole so that all its parts will be given effect. Preze v. Board of Trustees, 5 F.3d 272, 274 (7th Cir.1993); and related documents must be read together. Lippo v. Mobil Oil Corp., 776 F.2d 706, 713 n. 13 (7th Cir.1985). We examine the language and logic of the contractual documents. Bidlack v. Wheelabrator Corp., 993 F.2d 603, 607-609 (7th Cir.1993).
 
 
 8
 Murphy's claims rest almost entirely on extrinsic evidence so we must consider its proper place in our inquiry. First, we interpret the contract in light of the concrete circumstances in which it was written. See, e.g., Matter of Envirodyne Industries, Inc., 29 F.3d 301, 305-06 (7th Cir.1994). If, after placing the document in context, the court finds that a contract is unambiguous, it should interpret the contract as a matter of law. Ryan, 877 F.2d at 602. A contract is unambiguous if it is susceptible to only one reasonable interpretation, Illinois Conference of Teamsters and Employers Welfare Fund v. Mrowicki, 44 F.3d 451, 459 (7th Cir.1994), or put another way, a contract is ambiguous only if both parties were reasonable in adopting their different interpretations of the contract. See Miller, 39 F.3d at 760. And although extrinsic evidence can be used to show that a contract is ambiguous, see, e.g., AM International, Inc. v. Graphic Management Associates, Inc., 44 F.3d 572, 576-77 (7th Cir.1995), Colfax Envelope Corp. v. Local No. 458-3M Chicago Graphic Communications Intern. Union, AFL-CIO, 20 F.3d 750, 752-53 (7th Cir.1994), extrinsic evidence cannot be used to create an ambiguity. Central States, S.E. & S.W. v. Joe McClelland, Inc., 23 F.3d 1256, 1259 (7th Cir.1994); Johnson v. Georgia-Pacific Corp., 19 F.3d 1184, 1187 (7th Cir.1994). There is no contradiction here. The party claiming that a contract is ambiguous must first convince the judge that this is the case, AM International, 44 F.3d at 576-77, and must produce objective facts, not subjective and self-serving testimony, to show that a contract which looks clear on its face is actually ambiguous. See AM International, 44 F.3d at 575-76; Bristow v. Drake Street Inc., 41 F.3d 345, 351-52 (7th Cir.1994). Just as the court must determine whether a contract is ambiguous, so too the court must determine whether the extrinsic evidence offered in a given case interprets or contradicts the contract. See AM International, supra.
 
 
 9
 We have already applied these principles to disputes concerning the contractual vesting of welfare benefits and those cases have produced holdings relevant here. If a contract provides that benefits can be terminated, then those benefits do not vest. Ryan, supra. Where a contract of set duration is silent on the issue of vesting, we presume that benefits were not intended to vest. Senn v. United Dominion Industries, Inc., 951 F.2d 806, 816 (7th Cir.1992); Bidlack, 993 F.2d at 607. But that presumption can be rebutted by extrinsic evidence. Id.; see also AM International, 44 F.3d at 575-77. These principles inform our consideration of Murphy's claims, and the evidence he has offered to support them.
 
 
 10
 A. Murphy's Contract Claims Based on the CBA and the Plan
 
 
 11
 The documents relevant to Murphy's contract claims are the CBA and the Plan. In Article XXIII, the CBA provides that certain specified agreements, including the Plan, "will remain in effect during the term of this agreement all as heretofore agreed upon and revised." Article XXIII also provides that "[t]he language of such agreements is separate from and not a part of this agreement." Finally, the CBA provides that it:
 
 
 12
 together with ... any other matter incorporated herein by reference, concludes all collective bargaining between the parties for the duration of the Agreement, except as may otherwise be expressly provided for in this Agreement or any supplement hereto, or except as to such matters or amendments which may mutually be agreed to in writing by the parties.
 
 
 13
 Article XXV Sec. 25.1. For its part, the Plan states that it is maintained pursuant to the collective bargaining agreement between Keystone and ISWA. It also states that retiree coverage terminates "upon the date the Plan is terminated or amended to terminate the Retiree's coverage" and that coverage for a retiree's dependents terminates upon "[t]he date the Retiree's coverage terminates."
 
 
 14
 1. Murphy's claim under the CBA.
 
 
 15
 Keystone argues that Murphy's benefits did not vest under the CBA because it clearly indicates that the benefits provided by the Plan will remain in effect only for the duration of the CBA. As Keystone notes, the changes it announced in February 1993 did not take effect until after May 3, 1993, when the CBA expired. Thus, the changes did not violate the CBA. In response, Murphy argues that the CBA is ambiguous. Here, he relies on the language in Article XXIII of the CBA which states that "The language of [the Plan] is separate from and not a part of this agreement," and coverage language in the Plan stating that:
 
 
 16
 When a Retiree who retired after May 1, 1972, with thirty (30) years or more of accumulated service dies, his spouse shall be eligible to receive continued Basic and Major Medical Benefits (for which the spouse shall be eligible as though the Retiree had survived) at no cost. Coverage shall cease when the spouse remarries.
 
 
 17
 When a Retiree who retired after August 1, 1975, with twenty (20) years or more of accumulated service dies, his spouse shall be eligible to receive continued Basic and Major Medical Benefits (for which the spouse shall be eligible as though the Retiree had survived) at no cost. Coverage shall cease when the spouse remarries.
 
 
 18
 According to Murphy, Keystone's promise in the CBA that the Plan will "remain in effect" during the term of the CBA and the Plan's coverage language are best read together as follows: "the duration of benefits is for life and thereafter for the spouse and dependents unless the Plan is terminated or amended by agreement (or death)." Of course, Murphy's claim under the CBA really reduces to his claim under the Plan, but totally ignores the Plan's termination language.
 
 
 19
 Like the district court we find that the CBA unambiguously indicates that Murphy's benefits did not vest under the CBA. In Article XXIII Keystone promises that it will not terminate or amend the Plan while the CBA remains in effect. Thus, Murphy's benefits under the Plan are guaranteed by the CBA only for its duration; and it is equally clear that Keystone can terminate or amend the Plan after the expiration of the CBA, at least so far as the CBA is concerned. See Ryan, 877 F.2d at 603-04. Article XXIII, wherein Keystone promises not to terminate or amend the Plan during the term of the CBA, would be rendered meaningless or superfluous if the CBA is read any other way; this court cannot so alter that provision. See Preze v. Board of Trustees, 5 F.3d at 274.
 
 
 20
 2. Murphy's claims under the Plan.
 
 
 21
 According to Keystone, the Plan clearly does not provide retirees with vested benefits because it provides that retiree coverage ceases "upon the date the Plan is terminated or amended to terminate the Retiree's [or his dependent's] coverage." If the Plan can be terminated, Keystone argues, then it does not vest benefits. Murphy offers three responses. First, in reliance on the coverage language cited earlier, he argues that the Plan clearly vests benefits. Second, he argues that the Plan is a separate binding contract between the parties that can only be terminated or amended through bilateral negotiation. Here he relies on the pattern of negotiations between the parties to claim that changes to the Plan had to be negotiated. Third, Murphy argues that, assuming Keystone can unilaterally amend the Plan, Keystone did amend the Plan to vest benefits on a retiree-by-retiree basis via the so-called "exit agreements." We consider these contentions in turn.
 
 
 22
 Murphy's claim that the Plan vests welfare benefits must be rejected, because the Plan clearly and unambiguously indicates that Murphy's benefits do not vest. The Plan states that retiree benefits terminate "upon the date the Plan is terminated or amended to terminate the Retiree's [or his dependent's] coverage." Murphy urges us to read the coverage language cited earlier as vesting benefits. But if we did so, then the language providing for the termination of retiree benefits would be read out of the contract; those benefits would not be terminated when the Plan was terminated or amended to eliminate the retiree coverage. The express termination language is plainly inconsistent with any intent to vest benefits. See Ryan, 877 F.2d at 603-04; Gable v. Sweetheart Cup Co., Inc., 35 F.3d 851, 856 (4th Cir.1994).
 
 
 23
 Likewise, we reject Murphy's argument that the Plan can only be changed through bilateral negotiations. Here, Murphy argues that the Plan was an agreement between the parties, and the district court agreed after reviewing the long course of negotiations in the JIC concerning benefits. According to Murphy, this necessarily means that the Plan cannot be unilaterally amended or terminated.
 
 
 24
 We disagree because the terms of the CBA and the Plan were negotiated and executed, and therefore must be read together, see Lippo v. Mobil Oil Corp., 776 F.2d at 713 n. 13, and because both the Plan and the CBA rest on the same consideration: the mutual promises set forth in the CBA. Indeed Murphy has emphasized that over the years the terms of the Plan were negotiated along with the collective bargaining agreements. The documents confirm Murphy's assertion. Article XXIII of the CBA provides that the Plan shall remain in force and effect for the CBA's duration, the CBA expressly incorporates the Plan by reference, and the CBA's integration clause provides that the CBA "together with ... any other matter incorporated herein by reference, concludes all collective bargaining between the parties for the duration of the Agreement...." Article XXV, Sec. 25.1. Further, the Plan indicates that it is maintained pursuant to the CBA.
 
 
 25
 When these provisions are read together they clearly indicate that Keystone can amend or terminate coverage provided by the Plan unless the CBA prevents it from doing so. Article XXIII of the CBA prevents Keystone from terminating or amending the Plan during the term of the CBA and, by the same token, clearly indicates that Keystone can terminate or amend the Plan after the term of the CBA. If we accepted Murphy's argument that the Plan itself somehow limited Keystone's power to terminate or amend it, then Article XXIII of the CBA would be superfluous. In fact, the CBA places an express limitation on Keystone's power to terminate or amend the plan precisely because the Plan contains no such limitation. In short, Murphy's argument defies the language and the logic of the contractual documents at issue. See Bidlack, 993 F.2d at 607-09.
 
 
 26
 Further, Murphy's claim is untenable even if the Plan were read apart from the CBA. The Plan expressly indicates that it can be terminated, but it does not specify its expiration date. A contract of unspecified duration that does not place an express limitation on its termination is terminable at the will of either party unless the parties intended otherwise. See, e.g., Jeppesen v. Rust, 8 F.3d 1235, 1237 (7th Cir.1993); First Commodity Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007, 1012 (7th Cir.1985). Here, the Plan expressly provides that it can be terminated and therefore it must be regarded as terminable at will if considered apart from the CBA. And if Keystone can terminate the Plan, it can certainly extend its benefits, albeit on less generous terms, and promise not to terminate these benefits during the term of a subsequent collective bargaining agreement. Any other result would be untenable.
 
 
 27
 In fact, all of Murphy's objective extrinsic evidence confirms that our resolution reflects the intent of the parties. Early on, Keystone developed its Plan to provide certain health and insurance benefits for its employees. Over the years, Keystone and the Union negotiated the terms of the Plan in the JIC while the terms of the CBA were being negotiated. Bargained-for modifications of the Plan, which included retiree benefits, were often set forth in memoranda agreements attached to the CBA; later changes were set forth in the Plan. In short, Keystone made its promises relative to the Plan in exchange for the Union's promises set forth in the CBA, and all of those promises were binding for the duration of the CBA. The only evidence that contradicts this interpretation is the self-serving statements of Keystone employees and Union officials offered to establish their subjective belief that benefits vested. But this is the very sort of subjective and self-serving extrinsic evidence that cannot be used to create ambiguity. See Matter of Envirodyne, 29 F.3d at 304-305; AM International, 44 F.3d at 575-76; Bristow v. Drake Street Inc., 41 F.3d at 351-52.
 
 
 28
 Thus, we are left to consider the last contract theory properly raised on appeal, Murphy's claim that the so-called "exit agreements" are binding amendments of the Plan that vest benefits on a retiree-by-retiree basis. This claim has never been clearly advanced before the district court or on appeal, but Murphy seems to argue that the so-called "exit agreements" are amendments to the Plan that vested benefits on a retiree-by-retiree basis.[3] And in oral argument before the district court, Murphy did briefly argue that the so-called exit agreements were binding amendments of the Plan that fit within the CBA's integration clause but, unlike the CBA, vested benefits for individual retirees.
 
 
 29
 But Murphy's claim that the so-called "exit agreements" are amendments to the Plan is not plausible; at least not the way he has formulated the claim. Keystone and the Union are the parties to the CBA, not the retirees, see Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 175-76, 92 S.Ct. 383, 395-96, 30 L.Ed.2d 341 (1971), so these "exit agreements" are not agreements between Keystone and the Union that would come within the CBA's integration clause. Further, Murphy's characterization of the exit agreements as amendments to the Plan gets him nowhere, if considered by itself, because the Plan clearly provides that coverage ceases when the Plan is terminated or amended to eliminate coverage; so even if the exit agreements were amendments to the Plan, Keystone's subsequent changes would simply be later amendments that terminate coverage. Thus, the real gist of Murphy's claim is detrimental reliance. Murphy claims that the "exit agreements" are amendments to the Plan that Keystone cannot retract because retirees like him relied on those "amendments" when they decided to retire. And an estoppel claim based on a written representation can be advanced with respect to a single-employer unfunded welfare benefits plan, which might be the case here, although Murphy has not made that claim. See, e.g., Black v. TIC Investment Corp., 900 F.2d 112, 115 (7th Cir.1990); Miller v. Taylor Insulation Co., 39 F.3d at 758. But we cannot consider this theory because it was totally undeveloped both on appeal and before the district court. Although there were cases that might have supported Murphy's claim, he cited none of them; indeed he never even mentioned estoppel, and therefore Murphy's exit agreement claim is waived. See Thompson v. Boggs, 33 F.3d 847, 856 (7th Cir.1994) (perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived on appeal); Chambers v. American Trans Air, Inc., 17 F.3d 998, 1005 (7th Cir.1994) (same).[4]B. Murphy's ERISA Claim
 
 
 30
 Murphy also disputes the district court's resolution of his ERISA claim. Here, Murphy asserts that Keystone's failure to comply with Sec. 402(b)(3) of ERISA rendered the Plan unamendable and Keystone's amendments null and void. Murphy's claim is based on Section 402(b)(3) of ERISA, 29 U.S.C. Sec. 1102(b)(3), which states that all employee benefit plans shall "provide a procedure for amending such plan, and [a procedure] for identifying the persons who have authority to amend the plan." Id. It is undisputed that Keystone's Plan does not comply with Sec. 1102(b)(3). The question is whether Keystone's violation of this provision renders Keystone's Plan unamendable or renders Keystone's amendments null and void, a question left open by the Supreme Court. See Curtiss-Wright, --- U.S. at ----, 115 S.Ct. at 1231. While addressing these claims we note that Congress and the Supreme Court have instructed us to develop a federal common law to implement ERISA, see Thomason v. Aetna Life Ins. Co., 9 F.3d 645, 647 (7th Cir.1993), and that the principles of trust law have been employed when undertaking this task. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110-11, 109 S.Ct. 948, 954-55, 103 L.Ed.2d 80 (1988); Illinois Conference, 44 F.3d at 462-63.
 
 
 31
 The district court found that Keystone's failure to comply with 29 U.S.C. Sec. 1102(b)(3) did not entitle Murphy to the remedy he seeks: invalidation of Keystone's amendments. We agree. This circuit holds that technical violations of ERISA requirements do not justify relief absent a showing of bad faith, active concealment, or detrimental reliance. See Kreutzer v. A.O. Smith Corp., 951 F.2d 739, 743 (7th Cir.1991). And, like other circuits, we agree that this principle should apply in cases where a plan fails to comply with Sec. 1102(b)(3). See Aldridge v. Lily-Tulip, Inc. Sal. Ret. Plan Ben., 40 F.3d 1202, 1211-12 (11th Cir.1994); Biggers v. Wittek Indus., Inc., 4 F.3d 291, 295-96 (4th Cir.1993); Adams v. Avondale Indus., Inc., 905 F.2d 943, 949 (6th Cir.1990). This practice ensures that Sec. 1102(b)(3) allows recovery only where a breach of the provision has produced the harm that Sec. 1102(b)(3) seeks to prevent: defeating an employee's legitimate expectation of benefits. Aldridge, 40 F.3d at 1211-12; Avondale, 905 F.2d at 949.
 
 
 32
 Murphy was not prejudiced by Keystone's failure to comply with Sec. 1102(b)(3). Keystone is listed as the Plan's sponsor and administrator, and the Plan provides that it can be terminated or amended to terminate coverage. Thus, we agree that Keystone is best regarded as the settlor who has reserved the right to modify or revoke a trust, but has failed to specify a procedure for doing so. See Biggers, 4 F.3d at 295-96. In such a case, Keystone, like a trustee, has an inherent authority to amend its Plan provided its intent to amend the Plan is clearly manifested. Id. Here, Keystone put Murphy on notice concerning the amendments at issue in February of 1993. Keystone's notice clearly manifested its intent to amend the Plan; it also came over four months before the amendments became effective and much earlier than required by ERISA. See 29 U.S.C. Sec. 1024(b)(1)(B) (notice of material modifications to a plan must be communicated not later than 210 days after the end of the plan year in which the change is adopted) (emphasis added). In short, Murphy has not shown the bad faith, active concealment, or detrimental reliance that would justify granting him a substantive remedy for Keystone's violation of 29 U.S.C. Sec. 1102(b)(3).
 
 C. Notice of Appeal
 
 33
 There is one procedural matter that remains to be addressed: the sufficiency of Murphy's notice of appeal.[5] In this case, Murphy filed a notice of appeal that listed himself, the other named plaintiffs, and the Union as the appellants.[6] However, that notice of appeal did not expressly state that the named plaintiffs--excepting the Union--were appealing as class representatives rather than as individuals. Keystone argues that Murphy's notice does not satisfy the requirements of Fed.R.App.P. 3(c) so that this court does not have jurisdiction over class claims. Rule 3(c) provides:
 
 
 34
 (c) Content of the Notice of Appeal. A notice of appeal must specify the party or parties taking the appeal by naming each appellant in either the caption or the body of the notice of appeal.... In a class action, whether or not the class has been certified, it is sufficient for the notice to name one person qualified to bring the appeal as representative of the class.... An appeal will not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice.
 
 
 35
 Fed.R.App.P. 3(c) (emphasis added). The rule's requirements are jurisdictional. See Torres v. Oakland Scavenger Co., 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988).
 
 
 36
 As is evident, Rule 3(c) is susceptible to two readings. Keystone claims that the rule requires Murphy to (1) name at least one person qualified to bring the appeal, and (2) name that person as a representative of the class. According to Murphy, the amended rule does not require that he and the others listed indicate that they are appealing on behalf of the class.
 
 
 37
 Keystone has the better view. Prior to the 1993 amendments, Rule 3(c) was stringently applied by the Supreme Court and this circuit. See Torres v. Oakland Scavenger Co., 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988) (notice of appeal that named the first party to a suit and added "et al.," without any further specificity, did not perfect the appeal as to unnamed parties); Ooley v. Schwitzer Div., 961 F.2d 1293, 1305 (7th Cir.1992) (notice of appeal that named "Paul Ooley et al." failed to perfect appeal as to the class). And although the rule was amended in 1993 to liberalize its requirements, the question is how broadly (or liberally) those amendments should be read.
 
 
 38
 Murphy claims that naming any person qualified to be a class member perfects the appeal as to the class, but we do not think the 1993 amendments have so eviscerated the requirements of Rule 3(c). Subdivision (c) expressly provides that a notice of appeal will not be dismissed for failure to name a party, but only if that party's intent to appeal is otherwise clear from the notice. See Fed.R.App.P. 3(c). The advisory committee notes repeat this requirement and state that an appeal should not be dismissed where it is objectively clear from the notice of appeal that the parties intended to appeal. See Fed.R.App.P. 3, advisory committee notes regarding subdivision (c) (1993). In this case, when one looks at the notice of appeal there is no objective indication that Murphy and the other named plaintiffs were appealing as class representatives, even though Keystone may well have subjectively believed that this was the case. Indeed, Murphy's notice failed to include even the "et al." that might give him a colorable argument given the 1993 amendments. Cf. Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1572 (10th Cir.1994) (holding that a notice naming a class representative followed by "et al." is sufficient to preserve the appeal of class claims). Perhaps if only the named plaintiffs were included in the text of the notice, they could better argue that it would be "clear from the notice" that the whole class intended to appeal, even though they were not designated as "representative(s) of the class." Instead, in addition to naming Murphy and two other people, the notice named the Union, which is clearly not a class member, and in so doing limited the appeal to the specifically named parties--at least when the notice is read objectively. And clearly the rule does not apply only where there is a showing of actual prejudice, because the rule affects our appellate jurisdiction.
 
 
 39
 Further, adopting Murphy's de minimis view of amended Rule 3(c) would create difficulties that the rule's requirements are designed to prevent. As the committee notes reflect, in the class action context it will not always be clear whether putative class representatives are appealing the denial of class certification. See Fed.R.App.P. 3, advisory committee notes regarding subdivision (c) (1993). Sometimes the putative class representatives will decide to pursue only their individual claims on appeal, foregoing an appeal from a denial of class certification. If Murphy's interpretation of Rule 3(c) were adopted, then a defendant in a putative class action, and the appellate court, would not know whether the putative class representatives were appealing the denial of class certification until briefing. Likewise, other putative class members trying to decide whether they needed to appeal a denial of class certification, see United Airlines Inc. v. McDonald, 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977), would not be able to make this determination from the record in the case. The potential uncertainty created by Murphy's reading of Rule 3(c) far outweighs the minor burden that the rule imposes.
 
 
 40
 For all these reasons, Murphy's de minimis reading of Rule 3(c) must be rejected. In doing so, we note that our interpretation of amended Rule 3(c) comports with that of the only circuit to have discussed this issue. See Olenhouse v. Commodity Credit Corp., 42 F.3d at 1572 at n. 19. (Amended Rule 3(c) specifically endorses practice whereby a class of appellants is identified by "naming a designated member 'as a representative of the class.' ").[7] We have jurisdiction over the claims of the named plaintiffs only, because the notice of appeal in this case provided no objective notice that this appeal was taken on behalf of the certified class.[8]
 
 III. Conclusion
 
 41
 Neither the collective bargaining agreement between ISWA and Keystone, nor Keystone's employee welfare benefits plan, vested welfare benefits for the retirees who brought this suit. Nor have those retirees shown the bad faith, active concealment, or detrimental reliance that would justify granting a substantive remedy for Keystone's violation of 29 U.S.C. Sec. 1102(b)(3). Therefore, we affirm the district court.
 
 
 42
 ILANA DIAMOND ROVNER, Circuit Judge, dissenting in part.
 
 
 43
 I join the court in affirming the district court's judgment, but I cannot agree that we lack jurisdiction over those class members not named in the caption of the notice of appeal. (See ante at 569-71.) As I read the recent amendments to Fed.R.App.P. 3(c), the notice here was plainly sufficient to bring the entire class before the court.
 
 
 44
 The operative sentence addressing class actions, which was added by the December 1, 1993 amendments to Rule 3(c), provides as follows: "In a class action, whether or not the class has been certified, it is sufficient for the notice to name one person qualified to bring the appeal as representative of the class." Plaintiffs' notice here did exactly that. Indeed, it named three persons "qualified to bring the appeal as representative[s] of the class." The majority reasons, however, that the named plaintiffs were required to provide in their notice some objective sign that they were appealing as class representatives rather than as individuals. (Ante at 570-71.) Yet such a requirement ignores the plain language of the amended rule, which simply is not "susceptible to two readings." (Cf. ante at 570.) The amended rule does not insist that the notice name one person as representative of the class; it instead requires the notice "to name one person qualified to bring the appeal as representative of the class." Fed.R.App.P. 3(c) (emphasis added). The majority's view thus gives no effect to the words I have italicized, and especially to the operative word "qualified." It instead reads the sentence as if the italicized words had been omitted. See, e.g., Ratzlaf v. United States, --- U.S. ----, ----, 114 S.Ct. 655, 659, 126 L.Ed.2d 615 (1994) (statutory language should not be treated as surplusage in any setting).
 
 
 45
 The majority, in fact, pays scant attention to the sentence addressing class actions and focuses instead on the rule's final, more general statement: "[a]n appeal will not be dismissed ... for failure to name a party whose intent to appeal is otherwise clear from the notice." Fed.R.App.P. 3(c). But that sentence is in the nature of a "savings clause" and should not be read to impose an additional requirement not imposed by the class action sentence itself. Granted, the notes of the Advisory Committee also set out an objective test for judging a party's intentions (see ante at 570-71), yet that test does not purport to apply to a class action, which is a special breed of case addressed in the rule by a separate sentence and in the committee notes by a separate paragraph. And both the rule and the notes require that a notice name only "one person qualified to bring the appeal as a representative of the class." Fed.R.App.P. 3(c) & advisory comm. note to subdivision (c) (1993).
 
 
 46
 The majority also is concerned that my reading of the amended rule would create confusion because the notice of appeal would not necessarily reveal whether the named plaintiffs in an uncertified class action intended to appeal the order denying class certification. (See ante at 570-71.) But Rule 3(c) requires parties to also designate in their notice "the judgment, order, or part thereof appealed from," and by complying with that directive, the named plaintiffs would necessarily notify putative class members and this court whether they are challenging the district court's denial of class certification.
 
 
 47
 Finally, the majority's reliance on Olenhouse v. Commodity Credit Corp., 42 F.3d 1560 (10th Cir.1994), is puzzling. (See ante at 571 ("our interpretation of amended Rule 3(c) comports with that of the only circuit to have discussed this issue.").) That decision addressed the earlier version of Rule 3(c) and included only a single footnote briefly mentioning the 1993 amendment. 42 F.3d at 1571-72 & n. 19. The Tenth Circuit simply noted in that regard that "[t]he preferred means of identifying a class of appellants is by naming a designated member 'as representative of the class' " (id. at 1572 n. 19 (emphasis added)), and I most certainly agree. But the "preferred means" is not necessarily the only means available under the amended rule.[1] Olenhouse is therefore not authority for the majority's view here that because the "representative" designation was omitted from the notice, only the named plaintiffs are properly before the court.
 
 
 48
 For these reasons, I would hold that plaintiffs' notice of appeal was sufficient to bring the entire class before the court.
 
 
 
 *
 Hon. Charles R. Norgle, Sr., of the Northern District of Illinois, sitting by designation
 
 
 [1]
 Unless otherwise indicated, we refer to the plaintiffs collectively as "Murphy."
 
 
 [2]
 The whole thrust of Murphy's argument before the district court centered on the proper construction of the 1990 CBA, and therefore we, like the district court, focus on that contract
 
 
 [3]
 On appeal, Murphy now argues that the so-called exit agreements are bilateral contracts between Keystone and the individual retirees that vest benefits. We decline to address this theory because it was not raised before the district court, Pozzie v. U.S. Dept. of Housing and Urban Development, 48 F.3d 1026, 1030 n. 1 (7th Cir.1995), and there is also no factual support for this claim in the record. See Klosterman v. Western General Management, Inc., 32 F.3d 1119, 1125-26 (7th Cir.1994). We have encountered similar difficulties before and noted "A drafter who lacks a legal theory is likely to bungle the complaint (or the trial); you need a theory to decide which facts to allege and prove." Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir.1992). And while such defects are not fatal to a complaint, they become deadly when a motion for summary judgment is brought. See Klosterman, supra; Hickey v. A.E. Staley Mfg., 995 F.2d 1385, 1391-92 (7th Cir.1993)
 
 
 [4]
 For this same reason, no doubt, the record is devoid of the evidence needed to prove the elements of estoppel. In order to establish estoppel, Murphy needed to produce evidence from which a reasonable person could find that Keystone misrepresented or concealed the scope of retiree coverage, that Murphy reasonably relied on that misrepresentation or concealment, and that he had no knowledge or convenient means of ascertaining the true facts which would have prompted him to act otherwise. Krawczyk v. Harnischfeger Corp., 41 F.3d at 280. On the record before us, Murphy could not have reasonably believed that one sentence from one page of several documents distributed to him upon retirement totally displaced the elaborate negotiations and contractual framework that guaranteed benefits, including retiree benefits, for the past 30 years. Such reliance would be patently unreasonable. See, e.g., Krawczyk, supra, (plaintiff's reliance could not be reasonable where claimed benefit was simply too good to be true). And given Murphy's emphasis on the important role that the JIC played in negotiating and supervising the Plan, at least vis a vis Union employees, he certainly could not show that he did not have a convenient means of ascertaining the truth
 
 
 [5]
 Like the court in Ooley v. Schwitzer Div., Household Mfg. Inc., 961 F.2d 1293, 1305 (7th Cir.1992), we address this question last because we certainly have jurisdiction over the parties properly named in the notice of appeal
 
 
 [6]
 The Notice of Appeal as filed:
 William R. Murphy, W. Darrel McCabe, Richard L. Adkins, and Independent Steelworkers Alliance, Plaintiffs,
 vs.
 Keystone Steel & Wire, a Division of Keystone Consolidated Industries, Inc., a Delaware Corporation, and Keystone Steel & Wire Company Health Care Benefit Plan, Defendants.
 Case No. 93-1247
 Notice of Appeal to a Court of Appeals From a Judgment or Order of District Court
 Notice is hereby given that William R. Murphy, W. Darrel McCabe, Richard L. Adkins, and Independent Steel Workers Alliance, Plaintiffs, hereby appeal to the United States Court of Appeals for the Seventh Circuit from the Order entered in this cause on May 2, 1994 by Joe B. McDade, United States District Judge.
 May 31, 1994
 Ronald L. Hamm,
 Attorney for Plaintiffs
 
 
 [7]
 The dissent correctly notes that naming a designated member "as a representative of the class" is merely preferable under the Tenth Circuit's interpretation of Rule 3(c). Post at p. 571 & n. 1, citing Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1571-72 & n. 19 (10th Cir.1994). But Ooley, supra, shows that what is merely preferable in the Tenth Circuit is mandatory in the Seventh, because, unlike the Tenth Circuit, this court has held that "et al." is not sufficient to preserve a class appeal. And although we note that the 1993 amendments to Rule 3(c) could possibly require a different result in cases like Ooley, where an "et al." is used, that issue is not before us; Murphy did not even use an "et al." in his notice of appeal
 
 
 [8]
 Of course, to the extent that the retirees claim that their right to vested benefits arises from the CBA and the Plan negotiated by the Union while the retirees were Union members, the claims of the Union are virtually identical to those of the individual retirees. We need not decide whether, and to what extent, the Union could pursue claims on behalf of the individual retirees, however, because that issue was not raised, and it is not important given our resolution of the case
 
 
 [1]
 Indeed, Olenhouse found a notice using an "et al." designation sufficient to confer jurisdiction over the entire class even under the pre-amendment version of the rule. 42 F.3d at 1572. The majority responds, however, "that what is merely preferable in the Tenth Circuit is mandatory in the Seventh, because, unlike the Tenth Circuit, this court has held that 'et al.' is not sufficient to preserve a class appeal." (Ante at 571 n. 7 (citing Ooley v. Schwitzer Div., Household Mfg., Inc., 961 F.2d 1293, 1305-06 (7th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 208 (1992))). But Ooley, like Olenhouse, was decided under the earlier version of Rule 3(c), and there is no question in my mind that the notice there would be deemed sufficient to bring the entire class before the court under the 1993 amendments. Cf. Ford v. Elsbury, 32 F.3d 931, 933-34 (5th Cir.1994). As I have explained in the text, however, the sentence in the amended rule addressing class actions does not require even the et al. designation