Frank M. ROSSETTO, Jerry Skidmore, John S. Borowsky, Generoso Simons, and Machinists District 10, Individually and as Representatives of a Class of Persons Similarly Situated, Plaintiffs,

v.

PABST BREWING COMPANY, INC., Defendant.

No. 96–C–1086.

United States District Court, E.D. Wisconsin.

Nov. 1, 1999.

Matthew Robbins, Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C., Milwaukee, WI, for plaintiffs.

Dean E. Dennis, Hill, Farrer & Burrill, LLP, Los Angeles, CA & Charles P. Stevens, Michael, Best & Friedrich, LLP, Milwaukee, WI, for defendants.

## DECISION AND ORDER

CALLAHAN, United States Magistrate Judge.

On September 27, 1996, the Honorable Myron L. Gordon, Senior United States District Judge for the Eastern District of Wisconsin, wrote words that are as true today as they were when he wrote them, and are as applicable to this case as they were to the case then pending before him.

> The union retirees cannot succeed on their claim to vested lifetime health insurance benefits, but I share the humane thoughts made by the late Judge Hubert Will in his concurring opinion in *Senn [v. United Dominion Indus., Inc.,* 951 F.2d 806 (7th Cir.1992) ]. Although he agreed with his fellow judges on the appellate panel that the language of the collective bargaining agreement in that case barred the use of extrinsic evidence and necessitated the denial of lifetime benefits for the retirees, this greatly-admired judge added an expression of sympathy for retirees who have received and relied upon company financed life and health insurance plans for many years and who suddenly find themselves unprotected. This case is not an isolated example and is one of the reasons for the growing demand that some form of national health plan be adopted so that retirees and other persons will be able to afford and secure the medical services they need. *Senn,* 951 F.2d at 818.

*Pabst Brewing Company, Inc. v. Corrao,* 940 F.Supp. 217, 223–24 (E.D.Wis.1996).

## *INTRODUCTION AND PROCEDURAL BACKGROUND*

This action was commenced on September 19, 1996, when plaintiffs Frank M. Rossetto ("Rossetto"), Jerry Skidmore ("Skidmore"), John S. Borowsky ("Borowsky"), Generoso Simons ("Simons"), and District 10 of the International Association of Machinists and Aerospace Workers AFL—CIO ("District 10") filed this class action against Pabst Brewing Company, Inc. ("Pabst"). The original complaint alleged that a long line of collective bargaining agreements (CBAs) between Pabst and District 10 had provided retirees with health and welfare benefits that outlasted the expiration of the last collective bargaining agreement. Stated another way, the plaintiffs alleged that the last collective bargaining agreement provided for lifetime health and welfare benefits.

The most recent CBA covered the period from June 1, 1993, to June 1, 1995. Upon the expiration of that agreement, and failure of the parties to reach a new agreement, Pabst stopped providing the benefits. Hence, the filing of this lawsuit.

During the early pendency of this lawsuit, by agreements dated November 1, 1996, and December 6, 1996, Pabst voluntarily reinstated the disputed benefits and extended them until January 31, 1997. During this period of time, the parties attempted to resolve the issues raised in the lawsuit. Unfortunately, they were not able to do so. Accordingly, on February 13, 1997, the plaintiffs filed an amended complaint in which they set forth three claims. First, the plaintiffs alleged breach of contract under § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. Second, the plaintiffs alleged that Pabst's termination of the benefits constituted a willful violation of the employee benefit plan, actionable under §§ 502(a)(1)(B) and (a)(3) of ERISA, 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3). Third, the plaintiffs alleged that the entire issue should be arbitrated under § 301 of the LMRA.

On February 27, 1997, Pabst filed a counterclaim for declaratory judgment requesting this court find that Pabst's elimination of the retirees' benefits was not violative of ERISA and was not a breach of its obligations collectively bargained for under § 301 of the LMRA.

On March 4–6, 1997, this court certified the class and conducted an evidentiary hearing relative to the dispute's arbitrability, at the conclusion of which I ordered the matter to arbitration, issued a status quo injunction pending resolution of the griev-

ance, and ordered Pabst to continue the benefits.

Pabst appealed that ruling to the Seventh Circuit Court of Appeals. Rather than reach the merits of this court's order, however, on October 17, 1997, the Seventh Circuit held that District 10 lacked standing to bring the retirees' grievance to arbitration. Such being the case, District 10 did not have any right to represent the retirees making up the class in this case unless each of the retirees assented to its representation and the record contained evidence in that regard. See, *Rossetto v. Pabst Brewing Company, Inc.*, 128 F.3d 538 (7th Cir.1997). The Seventh Circuit vacated this court's order compelling arbitration and the injunction on the basis of District 10's lack of standing to bring the retirees' grievance to arbitration. *Rossetto*, 128 F.3d at 541. The matter was remanded for further proceedings in this court consistent with the Seventh Circuit's ruling. By virtue of that ruling, this court's order compelling arbitration and an injunction in aid thereof was vacated. District 10's request for rehearing and suggestion for rehearing en banc was thereafter denied, as was its petition for writ of certiorari. See *Rossetto v. Pabst Brewing Company, Inc.*, —— U.S. ——, 118 S.Ct. 2321, 141 L.Ed.2d 695 (June 15, 1998).

The Seventh Circuit's ruling, however, did not dispose of the merits of the plaintiffs' claim. To the contrary, Counts I and II of the plaintiffs' amended complaint remained to be resolved by this court. Consequently, I conducted a scheduling conference with the parties, at which time firm dates governing the pretrial processing of this action were set. Among those dates were deadlines for discovery cutoff and the filing of dispositive motions.

The parties thereafter undertook discovery and, consistent with this court's scheduling order, on March 1, 1999, Pabst filed a motion for summary judgment together with supporting documentation. Pabst's motion has now been fully briefed and is ready for resolution. For the reasons which follow, Pabst's motion for summary judgment is granted.

## FACTUAL BACKGROUND

The facts in this case, at least on some fronts, are fairly straight forward. Plaintiffs Rossetto, Skidmore, Borowsky, and Simons are Wisconsin residents and are representatives of the plaintiff class, which class consists of retired Pabst employees who were represented by District 10 during their employment, and their spouses and dependents. Pabst is a Delaware corporation, with its principal place of business in San Antonio, Texas. Pabst previously operated a brewery at 917 W. Juneau Avenue, Milwaukee, Wisconsin, which ceased production at the end of 1996. Pabst and District 10 are parties to a long line of collective bargaining agreements, the most recent of which covered the period from June 1, 1993, to June 1, 1995 (the "Agreement"). The Agreement's health and welfare provisions, i.e. Article VII of the Agreement, contain a "Dependent Benefit Clause" for dependents of retirees at subsection (c) thereof. That subsection states:

(c) The coverage described in subsections (a) and (b) shall continue for the covered dependents of a deceased retired employee to the end of the sixth month following the month in which death occurs.

(Agreement, p. 19).

The 1978 CBA was the first time that the Dependent Benefit Clause was provided for dependents of retirees, and subsection (c) remained a part of each successive contract from 1978 forward.

In order to fully appreciate the significance of the foregoing language, it is helpful to set forth, in more detail, certain portions of Article VII of the Agreement. Section 1 of Article VII provides, in pertinent part, as follows:

The Company, at its sole cost and expense, shall provide and furnish medical, health, dental, sickness and accident,

and life insurance coverage for employees actively at work in the bargaining unit and their dependents (including dependent children from age twenty-five (25) for life if totally and permanently disabled), and also to retired employees and their dependents, subject to the conditions specified herein. Said insurance coverage shall contain a coordination of benefits clause. The insurance coverage shall be purchased by the Company from insurance companies licensed to do business in the State of Wisconsin, and the policies of insurance and Blue Cross and Blue Shield participation contracts shall be in standard form and subject to the usual limitations and exclusions contained in such standard policies.

\*    \*    \*    \*    \*    \*

For Employees and Dependents:

(a) Pabst Brewing Company Medical and Dental Plan as currently provided.

(b) The Company will offer Family Health Plan and CompCare. If Family Health or CompCare increase their rates by more than twenty percent (20%) in a calendar year, the Company may, at its option, terminate the Plan by giving sixty (60) days notice to the Union. DentaCare is eliminated effective January 1, 1993.

(c) The coverage described in Subsection (a), (b), and (c), shall continue for the covered dependents of a deceased active employee to the end of the sixth month following the month in which death occurred.

For Retired Employees:

A death benefit in the amount of Two Thousand Dollars ($2,000), shall be increased to Four Thousand Dollars ($4,000) for employees retiring on or after August 1, 1978, and further increased to Five Thousand Dollars ($5,000) for employees retiring on or after August 1, 1981.

For Retired Employees and Dependents:

(a) Employees in retired status and their dependent spouse who are enrolled in government Medicare Plans A and B shall be provided Blue Cross and Blue Shield Medicare Extended coverage. The Blue Cross–Blue Shield Prescription Drug Program ($2.00 deductible per prescription) as described in Bulletin S462a is included provided, however, that such coverage shall be offset by the amount of any similar benefit for which such person may become eligible as a result of any future hospital-surgical legislation.

(b) In addition to the present riders now in effect for a retiree and/or his dependents not eligible for government Medicare Plans A and B, the coverage shall be the same as for Employees and Dependents.

(c) The coverage described in subsections (a) and (b) shall continue for the covered dependents of a deceased retired employee to the end of the sixth month following the month in which death occurs.

(Agreement, pp. 16–19).

The defendant claims that the Agreement in this case, in particular the dependent benefit clause, is unambiguous on its face and, therefore, provides no lifetime benefits to the plaintiffs, i.e., Pabst retirees. Moreover, argues the defendant, even if the dependent benefit clause, in the context of the total agreement, is ambiguous, the extrinsic evidence surrounding the adoption of the dependent benefit clause (that being objective evidence and the testimony of the plaintiffs' witnesses), demonstrates that there is no ambiguity in the dependent benefit clause which warrants a trial as to its meaning. In other words, the defendant argues that the Agreement itself is unambiguous in not providing lifetime benefits. And even if it is ambiguous on its face, the plaintiffs cannot succeed on their claim that the Agreement grants lifetime benefits to them because neither the objective evidence nor their own witnesses

raise a genuine issue of material fact on the question of whether it provides lifetime benefits.

In contrast, the plaintiffs argue that the Agreement does not unambiguously limit retiree benefits "for the term of the agreement" and, therefore, the parties' intent as to the meaning of the dependent benefit clause must be determined at trial. In that latter regard, the plaintiffs argue that the extrinsic evidence, including documents and witness testimony, establishes that the parties intended the retiree health benefits to be for life, or at least raises a material question of fact with respect thereto, thereby requiring a trial.

## *PABST'S MOTION FOR CLASS CERTIFICATION*

Pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure, Pabst has filed a motion requesting that the court enter an order determining that this action may be maintained as a class action for the benefit of the class consisting of all current Pabst retirees, their spouses and dependents, who were eligible for retiree life and health benefits pursuant to Pabst's collective bargaining agreements with Machinists District 10. The plaintiffs concur in Pabst's motion for class certification and agree that the named plaintiffs are proper class representatives. Because the parties agree that this action should proceed as a class action and that the named class should be certified as the plaintiff class, and because the court likewise agrees that the prerequisites of Rule 23, Fed.R.Civ. Proc., have been met, the defendant's motion will be granted.

Rule 23(a), Fed.R.Civ.Proc., lists four prerequisites to the certification of a class and the maintenance of a class action. Those prerequisites are: (1) that the class is so numerous that the joinder of all class members is impracticable; (2) that there are questions of law or fact common to the class; (3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class; and, (4) that the representative parties will fairly and adequately protect the interests of the class.

■ Here the four prerequisites have been met. First, with approximately 45 members in the class, the class is so numerous that it is impracticable to join all class members. Second, there are commons questions of law and fact affecting rights of each member of the class, as against Pabst. Third, the claims of the named plaintiffs are typical of the claims of the class of retirees. And, finally, the four named plaintiffs will fairly and adequately represent and protect the interests of all members of the class, and have secured the representation of an attorney knowledgeable in the prosecution of the type of claims asserted in the Amended Complaint.

In their response to the defendant's motion for class certification, however, the plaintiffs also request that the court recognize District 10 as a representative of the class. Pabst has not opposed this request.

■ As the plaintiffs have set forth in their response, the Seventh Circuit has held that a union may sue on behalf of its members for the purpose of seeking injunctive or declaratory relief. See *Local 194 v. Standard Brands*, 540 F.2d 864, 865 (7th Cir.1976). In *Local 194*, the court held that, in light of *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), a union has standing "to represent its members who have allegedly suffered from discriminatory employment practices in so far as injunctive and declaratory relief is claimed. The union does not, however, have standing to seek, on behalf of the class, back pay or other individualized forms of monetary relief." *Local 194*, 540 F.2d at 865. Part of the relief which the plaintiffs seek in their amended complaint is declaratory and injunctive. Thus, in light of the Seventh Circuit's decision in *Local 194* (and because the defendant has not opposed the plaintiffs' request), I will also recognize District 10 as a proper plaintiff with standing to sue on behalf of

its members, at least in so far as the plaintiffs are seeking declaratory and injunctive relief.

In conclusion, this action is hereby certified as a class action with the class being defined as all current Pabst retirees, their spouses and dependents, who were eligible for retiree life and health benefits pursuant to Pabst's collective bargaining agreements with Machinists District 10.

## THE PRELIMINARY INJUNCTION

Before I address the merits of the parties' respective arguments, I believe it is appropriate to comment briefly upon the court's previously entered preliminary injunction or, to be more specific, what precisely was resolved in the court's preliminary injunction order and the context in which it was resolved.

Count III of the plaintiffs' amended complaint set forth a claim seeking an order compelling arbitration on the question of whether the Agreement provided lifetime benefits for retirees. Much (although not all) of the materials and arguments presented during the course of the preliminary injunction hearing centered on the question of whether Pabst retirees were considered "employees" under the Agreement. If they were not, then they could not proceed to arbitration on their claim of entitlement to lifetime benefits.

Article XI of the Agreement defines how "grievances or misunderstandings between the Company and its employees," and the arbitration thereof, were to be handled. And, obviously, if those individuals referred to as "retirees" in the Agreement were not also considered "employees" under the Agreement, then they could not arbitrate their dispute over the matter of lifetime benefits. And if they could not arbitrate that question, then any injunction in aid of arbitration would have been rendered unnecessary. Of course, this would not have rendered entirely moot the question of a preliminary injunction. It is just that the standard of proof required for the entry of a preliminary injunction in that latter circumstance would have been different than the standard of proof required for the entry of an injunction in aid of arbitration. This then gets me to the point.

At the conclusion of the preliminary injunction hearing, I concluded, for reasons set forth on the record at that time, that the plaintiffs' claim that the Agreement afforded them lifetime health and life benefits was arbitrable. I emphasized that I was not ruling that the Agreement so provided lifetime benefits. I only ruled that the question was one for an arbitrator to decide because I was persuaded that "retirees" under the terms of the Agreement were also to be considered "employees" under the Agreement.

Having determined that the underlying dispute was arbitrable, I then turned to consideration of the plaintiffs' motion for preliminary injunction in aid of arbitration. The standard to be applied under such circumstances was set forth in *Local Lodge No. 1266, International Assoc. of Machinists and Aerospace Workers, AFL—CIO v. Panoramic Corporation*, 668 F.2d 276 (7th Cir.1981). In Panoramic, the court held that "a plaintiff ... seeking to maintain the status quo pending arbitration ... need only establish that the position he will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor." *Panoramic*, 668 F.2d at 285. If the plaintiffs were able to meet that requirement, they next had to demonstrate the existence of actual or threatened irreparable injury. "An injunction in aid of arbitration is appropriate ... only when the actual or threatened harm to the aggrieved party amounts to a frustration or vitiation of arbitration," i.e., so irreparable that a decision in his favor would be but an empty victory. *Panoramic*, 668 F.2d at 286. Finally, in considering the plaintiffs' motion for preliminary injunction in aid of arbitration, I was to balance the respective hardships that each party would suffer should I rule against them. In other words, before I could enter a status quo injunction, I would have

had to find that the plaintiffs would suffer more from the denial of the injunction than would Pabst from its issuance. *Panoramic*, 668 F.2d at 288.

It was in the context of the aforestated first element, i.e., that the position the plaintiffs would espouse in arbitration was sufficiently sound to prevent the arbitration from being a futile endeavor, that I, again for reasons stated more particularly on the record at that time, found ambiguities, or vagueries, in the Agreement. At no time did I find that the plaintiffs had a likelihood of success on their claim. Rather, I found that there were sufficient ambiguities in Article VII of the Agreement with respect to the issue of vesting of benefits that the plaintiffs' position was sufficiently sound to prevent the arbitration from being a futile endeavor. In other words, I found that there was a genuine dispute with respect to an arbitrable issue.

However, that I made such finding in the context of a request for a status quo injunction in aid of arbitration does not necessarily mean that I found, for all purposes, that the language of the Agreement is ambiguous. I did not. All this is to say that, in my view, at this stage, i.e., the summary judgment stage, the slate is clean on the issues presented by this lawsuit. This includes the question of whether the language of the Agreement in this case, on its face, is or is not ambiguous. It is with this mind set that the court will address the merits of the defendant's motion for summary judgment.

## *SUMMARY JUDGMENT STANDARDS*

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.

The purpose of summary judgment is to "pierce the pleading and to assess the proof in order to see whether there is a genuine issue for trial." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The standard governing summary judgment is clear: '[I]f no rational jury could, on the evidence presented in the summary judgment proceeding, bring in a verdict for the party opposing summary judgment ... then summary judgment must be granted.'" *Oates v. Discovery Zone*, 116 F.3d 1161, 1175 (7th Cir. 1997) (quoting *Visser v. Packer Engineering Associates*, 924 F.2d 655, 660 (7th Cir. 1991)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A party opposing a properly supported summary judgment motion "may not rest upon mere allegations or denials" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P.; see also *Reid v. Norfolk & Western Ry. Co.*, 157 F.3d 1106, 1110 (7th Cir.1998). "To state it differently, a party will be successful in opposing a summary judgment motion only when they present definite, competent evidence to rebut the motion." *Smith on Behalf of Smith v. Severn*, 129 F.3d 419, 426 (7th Cir.1997).

To determine if a genuine issue of material fact exists, the court must review the record, construing all facts in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See *DiGiore v. Ryan*, 172 F.3d 454, 460 (7th Cir.1999). " 'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir.1999). However,

neither "the mere existence of some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec.*, 475 U.S. at 586, 106 S.Ct. 1348, is sufficient to defeat such a motion. See *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 981–82 (7th Cir.1999).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

## THE MERITS OF THE MOTION FOR SUMMARY JUDGMENT

The first, and ultimately the dispositive, question that the court has to resolve in this case is whether the language which is found in Article VII of the most recent collective bargaining agreement (i.e., that which covered the period from June 1, 1993 to June 1, 1995), and which language speaks to the rights of retirees to health and welfare benefits, is ambiguous with respect to whether such benefits are lifetime benefits. As stated previously, in the view of the defendant, the Agreement in this case is unambiguous on its face in not providing lifetime benefits. Moreover, according to the defendant, even if one were to consider the extrinsic evidence produced by the plaintiffs in support of their position, such evidence fails to show either that a "contract that appears to be clear is actually ambiguous" or that the parties intended a lifetime benefit.

In contrast, the plaintiffs argue that the Agreement is ambiguous. Therefore, they argue that it is necessary to examine extrinsic evidence in order to determine the intent of the parties with respect to the granting of lifetime benefits; that such an examination reveals a genuine dispute on such issue; and, therefore, that summary judgment is not appropriate. Rather, a trial is necessary on the issue of the parties' intent.

Both parties seem to acknowledge that the starting point for analysis in this case is the Seventh Circuit's en banc decision in *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603 (7th Cir.1993). In *Pabst Brewing Company, Inc. v. Corrao*, 161 F.3d 434, 439 (7th Cir.1998), the court of appeals stated, in discussing *Bidlack*, that "*Bidlack* involved an assertion of a right to lifetime health benefits on behalf of retired employees of a company. As the court pointed out there, whether or not the retirees were entitled to such benefits depended entirely on the contract between the company and the employees, and there, as here, that contract was a collective bargaining agreement. *Id.* at 604–05. ERISA does not require the vesting of welfare benefits; if they vest at all, they do so under the terms of a particular contract." *Corrao*, 161 F.3d at 439.

In *Corrao* the court went on to state that:

[t]he first question considered in *Bidlack* was whether the absence of express language in the CBA indicating that the retirees had a vested right in lifetime health benefits was fatal to their claim. Qualifying the earlier decision in *Senn v. United Dominion Industries, Inc.*, 951 F.2d 806 (7th Cir.1992), both opinions in support of the result concluded that it was not. The lead opinion also recognized that it is possible for a contract to create obligations that survive the termination of the agreement, such as a post-employment restrictive covenant or a commitment to arbitrate disputes. Nevertheless, because of the gravity of assuming that a fixed term contract (as CBAs invariably are) has created a perpetual obligation, the lead opinion argued for a presumption that a CBA ceases to obligate the employer when its term is up.... Rejecting the twin extremes of requiring an explicit formula of words to defeat the presumption and of permitting unlimited testimony about

the parties' subjective intentions, the lead opinion adopted the middle ground, whereby the language of the agreement would govern unless the parties could show that extrinsic evidence was necessary (1) to show that a written contract that appears to be clear is actually ambiguous, (2) a term or terms in the contract are ambiguous, or (3) that there is "some yawning void ... that cries out for an implied term." .... If the agreement is plausibly complete on its face, then extrinsic evidence cannot be used to add terms to it. *Id.*

Applying these rules to the agreements before it, a majority of the judges in *Bidlack* agreed that they were vague and inconclusive on the question whether some kind of right to lifetime health benefits had vested in the retirees.... Some terms, such as one similar to the spousal benefit clause here, said once retirees reached the age of 65 the company would pay the full cost for their health insurance, and that after their death, their spouses would receive supplemental health benefits, again at the company's expense. Because nothing in the agreement qualified that clause or tried to tie it to the duration of the CBA, the majority favoring reversal thought that it offered some evidence that the benefits were to last for life. *Id.* Without extrinsic evidence to clarify the CBA, it was impossible to say whether the company had promised lifetime health benefits or not....

Post-*Bidlack* decisions in cases involving retiree entitlements to health or welfare benefits have reflected the critical importance of the language of the agreement. In *Murphy v. Keystone Steel & Wire Company* [61 F.3d 560 (7th Cir. 1995) ], the court upheld a grant of summary judgment for the company on the ground that the contract was unambiguous and that it clearly indicated that the retirees' benefits did not vest. Unlike the CBA in *Bidlack*, the one in *Murphy* addressed the duration of the benefits and provided that they would "remain in effect during the term of this

agreement...." 61 F.3d at 565. The Plan itself said that retiree coverage would terminate "upon the date of the Plan is terminated or amended to terminate the Retiree's coverage." *Id.* at 565–66. The court found that extrinsic evidence could not be used to contradict the meaning of these terms, but it also commented that the plaintiff's objective extrinsic evidence was consistent with its reading all the CBA in any event. *Id.* at 567. On the other hand, in *Diehl v. Twin Disc, Inc.*, 102 F.3d 301 (7th Cir.1996), the court reviewed a retiree benefit claim brought under an agreement that explicitly said that "[a]ll persons retired prior to the date of termination of the [Retirement] Plan ... shall, notwithstanding [the Insurance Agreement], be entitled for the lifetime of the pensioner (including the surviving spouse until death or remarriage), to the life insurance and hospitalization, medical and surgical expense benefit coverages ..." *Id.* at 302–03. Even though there were other parts of the agreement that might have supported a finding in the company's favor, the court found this to be enough to show that the contract gave the retirees certain vested rights in a lifetime benefit. It remanded for further proceedings to explore the question whether certain modifications to the plan effectively cut off of retirees' rights. *Corrao*, 161 F.3d at 440–41.

In *Corrao*, the Seventh Circuit affirmed the decision of the lower court, which had found in favor of defendant Pabst (the same Pabst Brewing Company that is the defendant in the case at bar). In doing so, the Seventh Circuit found that the CBA in question did not provide lifetime health benefits because the CBA included a clause which "contained the central promise by Pabst, the employer, to provide 'major medical, health, dental, sickness and accident, and life insurance benefits' to its employees—active and retired alike [and that] promise extended 'for the term of this Agreement.' "

In *Corrao*, the court acknowledged that the spousal benefit clause in the CBA in question did not have in it the phrase "whichever occurs first". And it was the absence of such a phrase that the Seventh Circuit found to have created an ambiguity in *Bidlack*. ("For the provision [i.e. the CBA spousal benefit clause] does not say 'when they die or the collective bargaining agreement expires, whichever occurs first', but simply when they die." *Bidlack*, 993 F.2d at 608.) But, the CBA in *Corrao* did contain language, which language was found in Article VII thereof, that the court determined unambiguously limited the benefits in question to the term of the agreement, rather than possibly for life. That precise language was:

> *For the term of this Agreement*, the Employer, at its sole cost and expense, shall provide major medical, health, dental, sickness and accident, and life insurance benefits in accordance with an[d] as summarized in Appendix A attached. It is understood that the benefits set forth may be provided by specifically referred to plans or equivalent benefits will be provided under different plans including self insurance by the Employer, and further that the actual insurance policies, documents or plans shall control over the summary set forth in Appendix A in the event of conflicting provisions. (emphasis provided)

The Agreement in the case at bar does not contain language precisely matching that found by the court in *Corrao* to have *not* created an ambiguity regarding the question of lifetime benefits. Article XVI of the Agreement, however, which article was executed by the parties on September 1, 1993, does state:

> This Agreement, signed this 1st day of Sept[ember], 1993, shall become effective July 1, 1993, and shall remain in effect until the 1st day of July, 1995, there after automatically renewing itself from year to year until either party hereto give to the other a sixty (60) day written notice prior to July 1, 1995, or before the end of any subsequent year of a desire to change this Agreement.

> The invalidity of any clause in this Agreement shall not affect the validity of the remainder of this Agreement.

> All provisions of this Agreement are subject to applicable federal and state law and regulations.

Quite obviously, the above quoted language does not include the phrase "for the term of this agreement", and it was the presence of that phrase in the *Corrao* CBA that led both the district court and the court of appeals to find that particular CBA to have unambiguously *not* provided lifetime benefits. Such being the case, I am unable to find that *Corrao* is "on all fours" with the case at bar. In other words, Article XVI does not unambiguously indicate that the health and welfare benefits are not lifetime benefits.

■ But, I am likewise unpersuaded that the above language found in Article XVI of the Agreement unambiguously indicates that the health and welfare benefits are lifetime benefits. Thus, in order to ascertain whether the Agreement on its face unambiguously does or does *not* provide lifetime benefits, it is necessary to examine Article VII and, in particular, the language thereof relating to benefits for retirees and their dependents. In doing so, the court will bear in mind, as it must, that in *Bidlack* the court of appeals held there to be a presumption "that a collective bargaining agreement ceases to obligate the employer when the agreement's term (invariably three years) is up [although] it is not an irrebuttable presumption." *Bidlack*, 993 F.2d at 607. I must also keep in mind that if the collective bargaining agreement is merely completely silent on the duration of benefits for retired employees, and if nothing in the structure of the agreement requires the duration to be perpetual, then extrinsic evidence will not be allowed to show that the retirees have a perpetual entitlement. *Id.* at 608.

The court will also bear in mind that the operative provision in *Bidlack*, which the Seventh Circuit found, on its face, to be

ambiguous, was substantially different from the operative provision found in the case at bar. In *Bidlack*, that provision was as follows:

"[T]hose employees who have retired since September 22, 1959, will have the full cost of their Blue Cross–Blue Shield coverage paid by the Company after they attain sixty-five (65) years of age" and ... they would be entitled to certain supplemental health benefits, also paid for by the Company, "which, combined with Medicare, will provide a level of benefits equal to the Wheelabrator Blue Cross–Blue Shield plan for active and retired employees sixty-five (65) years of age or over" and which "shall be continued for the spouse after the death of the retiree."

*Bidlack*, 993 F.2d at 605.

Those subsections of Article VII of the Agreement which are, at least as a first step in the analysis, relevant in this case are found at page 19 of the Agreement. They state, with respect to "Retired Employees and Dependents", that "(a) Employees in retired status and their dependent spouse who are enrolled in government Medicare Plans A and B *shall be provided* Blue Cross and Blue Shield Medicare Extended coverage ... (b) [i]n addition to the present riders now in effect for a retiree and/or his dependents not eligible for government Medicare Plans A and B, the coverage shall be the same as for Employees and Dependents [and] (c) [t]he coverage described in subsections (a) and (b) *shall continue* for the covered dependents of a *deceased retired employee* to the end of the sixth month following the month in which death occurs." (emphasis provided)

The operative language in the above quoted portions of the Agreement consists of the phrases "shall be provided" and "shall continue". Obviously, such phrases denote the extending of benefits to retired employees and their dependents for at least some period of time into the future. And obviously the triggering date for the six month extension of benefits for a de-pendent of a deceased retired employee is the date of death of the retired employee. But can the language found at subsection (a) be reasonably construed to mean that the benefits referred to in that subsection have been granted to retired employees and their dependent spouse for life? And can the language found at subsection (c) be reasonably construed to mean that the benefits referred to in subsections (a) and (b) will, at the death of the retired employ-ee, assuming he dies, for example in the year 2010, have already been extended from 1995 through 2010 by the terms of the Agreement?

Interestingly, remarkably similar lan-guage to that found in subsection (c), above, is found in subsection (c) of that section of Article VII dealing with "Em-ployees and Dependents". That section, found at pages 18–19 of the Agreement, sets forth the medical and dental plans that will be provided to those currently working at Pabst. And subsection (c) states that "[t]he coverage described in Subsection (a), (b), and (c)(sic) *shall con-tinue* for the covered dependents of a *de-ceased active employee* to the end of the sixth month following the month in which death occurred." Moreover, Section 1 of Article VII states that "[t]he Company, at its sole cost and expense, *shall provide* and furnish medical, health, dental, sickness and accident, and life insurance coverage for employees actively at work in the bar-gaining unit and their dependents (includ-ing dependent children from age twenty-five (25) for life if totally and permanently disabled), and also to retired employees and their dependents, subject to the condi-tions specified herein." (emphasis provid-ed).

In other words, the Agreement states that the Company "shall provide" both to active employees and to retired employees certain defined health and welfare bene-fits. The Agreement also grants both to the dependents of a deceased retired em-ployee and to the dependents of a de-ceased active employee continuation of

"coverage" to the end of the sixth month following the death of the retired or active employee. (The court notes that in the two subsection (c)'s there is a difference in tense of the word "occur"; in the Retired Employee subsection (c) it is the past tense, and in the Active Employee subsection (c) it is the present tense. However, I do not find such difference to make a material difference in my analysis).

■ That the Agreement contains language virtually identical in character when referring to (1) the providing of benefits, in the first instance, to active employees and to retired employees and their dependents, and (2) the continuation of health and welfare benefits to the dependents of deceased active employees and to the dependents of deceased retired employees is, in my opinion, extremely telling. For, the plaintiffs do not argue that the Agreement granted *lifetime* health and welfare benefits to those who were active employees at the time of its execution. Indeed, they would be hard-pressed to reasonably do so in light of the court of appeals' decision in *Bidlack*. And if the express language of the Agreement fails to grant lifetime health and welfare benefits to those who were active employees at the time of its execution, does it not follow that that same express language fails to grant lifetime health and welfare benefits to those who were retired employee at the time of the Agreement's execution? I believe that it does.

This conclusion is fortified by the aforequoted language from Section 1 of Article VII. That section expressly and unambiguously provides that there is, indeed, a category of individuals for whom lifetime health and welfare benefits will be provided by Pabst—dependent children of active employees in the bargaining unit if they (that is, the dependent children) are totally and permanently disabled, such benefits being provided from age twenty-five (25) for life. Thus, if the parties truly intended to extend lifetime health and welfare benefits to retired employees and their dependents, the language of Section 1 of Article

VII shows that they knew how to draft language which would effectuate such intention.

■ More importantly, however, the absence of such language leads me to conclude that the Agreement is not merely ambiguous or vague regarding the duration of health and welfare benefits for retired employees; instead, it is "completely silent on the duration of health benefits for retired employees". *Bidlack*, 993 F.2d at 608. And because there is nothing in the structure of the Agreement that requires the duration be perpetual or some "yawning void [in the Agreement] ... that cries out for an implied term", I am compelled to find, in accordance with the *Bidlack* decision, that "the presumption that all contractual obligations cease on the expiration date stated in the contract" is extant in this case. See *id.* Stated another way, I am persuaded that the Agreement is not ambiguous regarding the question of whether, under its express terms, retired employees are provided lifetime benefits. Under its terms, they are not.

Indeed, the language found in the Agreement is similar to that found in a CBA addressed by the court in the recent case of *International Union, United Auto., Aero. & Agri. Implement Workers v. Skinner Engine Co.*, 188 F.3d 130 (3rd Cir.1999). And in *Skinner* the court found such language to unambiguously not provide lifetime benefits to retired employees. In arriving at this conclusion the court first noted that the phrases, "will continue" and "shall remain," in the CBAs did not unambiguously indicate that the benefits would continue ad infinitum, as argued by the retirees. *Id.* at 141–42. Nor, when read in their in their appropriate contexts within the CBA, could those phrases be interpreted to mean that Skinner would pay for such benefits for the life of a retiree. *Id.* at 142–43. The court stated:

Accordingly, when read in proper context, there appears no textual support for the appellants' contention that the use of the phrases, "shall remain" and

"will continue," manifested an intent on the part of contracting parties to vest life and medical insurance benefits for retirees. Rather than indicating a promise on the part of the company to provide such coverage prospectively for the life of the retiree, the phrases were used to indicate a continuation of prior practice and policies. Appellants' contentions here have legitimacy only if this court were to view the phrases in a vacuum, without considering the appropriate contexts in which they were used. . . .

The above conclusion is supported by the fact that the company's representation that it "will continue" to provide medical insurance benefits appears to have applied to both active employees and retirees. Clearly, the medical insurance benefits did not vest for active employees, and there has been no argument to the contrary. Yet, the CBA provisions make no material distinction between active employees and retirees in this regard. The only reasonable conclusion—if one begins with the uncontroversial premise that benefits for active employees were not vested—is that benefits for retirees were likewise not vested.

*Skinner*, 188 F.3d at 143–44.

As stated previously, the parties have submitted to the court extrinsic evidence in support of their respective positions. It is well settled, however, that extrinsic evidence may not be used to create an ambiguity where none exists. As the Seventh Circuit stated in *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560 (7th Cir.1995),

> [A]lthough extrinsic evidence can be used to show that a contract is ambiguous . . . extrinsic evidence cannot be used to create an ambiguity. . . . There is no contradiction here. The party claiming that a contract is ambiguous must first convince the judge that this is the case . . . and must produce objective facts, not subjective and self-serving testimony, to show that a contract which

looks clear on its face is actually ambiguous. . . . Just as the court must determine whether a contract is ambiguous, so too the court must determine whether the extrinsic evidence offered in a given case interprets or contradicts the contract.

*Murphy*, 61 F.3d at 565.

In support of their position that the Agreement is ambiguous on the question of duration of benefits for retirees, the plaintiffs have presented select documents and the deposition testimony of various individuals in a effort to show, inter alia, how the bargaining history behind the Agreement demonstrates "that when Pabst and The Machinists negotiated the dependent benefit clause, they understood that retirees' health insurance already extended until the retirees' death; the dependent benefit built upon the already existing lifetime benefit for retirees." (Plaintiffs' Brief in Opposition to Summary Judgment, p. 5). That is to say, the plaintiffs' extrinsic evidence is offered to show that the words of the Agreement do not mean what they say. They mean something else (or, more precisely, they were intended to mean something more than what they say) and, therefore, the Agreement is, or at least portions of it are, ambiguous. In my view, however, what the plaintiffs are attempting to do is precisely what the Seventh Circuit said could not be done by use of extrinsic evidence. They are attempting to create an ambiguity where none exists within the four corners of the document. Although their effort is an understandable and noble effort to save their case, it is, in the end and for the reasons stated, an effort that must fail. Accordingly, I have disregarded such extrinsic evidence in reaching my decision in this case.

### CONCLUSION

And so we have reached that stage where the court must issue its ruling. It is not a ruling which I issue cavalierly. Nor is it a ruling which I take particular

pleasure in issuing. Sadly, however, it is a ruling which I am persuaded that the law and the terms of the Agreement compel. Lifetime benefits may be what the plaintiffs in this action expected the Agreement would provide them. But, lifetime benefits is not what the Agreement did, in fact, provide them. Such being the case, the defendant's motion for summary judgment must be granted.

**NOW THEREFORE IT IS OR-DERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that judgment be entered in favor of the defendant and against the plaintiffs on the plaintiffs' claims for violations of ERISA and § 301 of the LMRA;

**IT IS FURTHER ORDERED** that judgment be entered in favor of the defendant and against the plaintiffs on the defendant's claim for declaratory relief that the Pabst Brewing Company, Inc.'s termination of eligibility and elimination of benefits to the retirees under the Agreement is not violative of ERISA, is not a breach of its collectively bargained obligations in violation of § 301 of the LMRA, and is otherwise lawful in all respects;

**IT IS FURTHER ORDERED** that the plaintiffs' motion for class certification be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED.**

**SO ORDERED.**